IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| B.D., by and through his Parents, | : | |
| B.D. and J.D., and B.D. and J.D., | : | |
| Individually, | : | No. 1:20-cv-01944 |
| **Plaintiffs** | : | |
| | : | **(Judge Kane)** |
| v. | : | |
| | : | |
| CORNWALL LEBANON SCHOOL | : | |
| DISTRICT, | : | |
| **Defendants** | : | |

<u>**MEMORANDUM**</u>

Before the Court is Defendant Cornwall Lebanon School District ("Defendant" or

"CLSD")'s partial motion to dismiss (Doc. No. 7) several counts of Plaintiffs B.D. ("BD"), by

and through his Parents, B.D. and J.D. ("Parents"), and B.D. and J.D., individually (collectively,

"Plaintiffs")' complaint (Doc. No. 1) for failure to state a claim upon which relief may be

granted.  For the reasons provided herein, the Court will grant in part and deny in part

Defendant's motion.

I.    **BACKGROUND**[1]

Plaintiff BD is the minor son of Plaintiffs B.D. and J.D., all of whom reside within the

boundaries of Defendant's school district.  (Doc. No. 1 ¶¶ 10-11.)  Defendant is a school district

created and existing under the laws of the Commonwealth of Pennsylvania with an office located

at 105 East Evergreen Road, Lebanon, Pennsylvania.  (<u>Id.</u> ¶ 16.)  BD is a student who is nearly

---

[1] The following factual allegations, accepted as true for purposes of the instant motion to
dismiss, are taken from Plaintiffs' complaint.  The Court notes that Plaintiffs' complaint refers to
four exhibits – Exhibits A through D – as being attached to the complaint.  However, no exhibits
were filed with the complaint on October 21, 2020, but instead were filed on October 27, 2020.
(Doc. No. 3.)  Because Plaintiffs refer to the exhibits in the complaint as being attached thereto,
and docketed them as "exhibits to complaint," the Court refers to those documents where
appropriate in its recitation of the background of this case.

thirteen (13) years old and currently attends Cedar Crest Middle School in CLSD, where he is in seventh grade.  (Id. ¶ 12.)  BD has been enrolled in CLSD since kindergarten.  (Id. ¶ 44.)  BD is a student with a disability under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., and a "qualified individual with a disability" within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), as he has been diagnosed with "Ketonic Hypoglycemia, Fine Motor Delay and a Seizure Disorder, which is epileptic in nature, and a speech and language disorder."  (Id. ¶¶ 1, 13.)  Further, "a neuropsychological report completed by the Children's Hospital of Philadelphia ("CHOP"), dated June 5, 2019, diagnosed [BD] as a child with Attention Deficit/Hyperactivity Disorder – Combined Presentation (F90.2); Developmental Coordination Disorder (F82), and Adjustment Disorder with mixed anxiety and depressed mood (F43.23)."  (Id. ¶ 13.)  BD is eligible for special education and related services under the IDEA, as he has impairments that substantially limit him in major life activities, specifically the activities of speech, communication, socialization, and learning.  (Id. ¶ 14.)

This action seeks review of certain findings in a final decision and order (the "Hearing Officer Decision")[2] entered in an administrative due process proceeding conducted under state law, and confirmation of other findings of fact and conclusions of law in the Hearing Officer Decision, ultimately seeking a remedy of compensatory education against Defendant for a certain period during which Plaintiffs contend that "Defendant CLSD denied Plaintiff BD a free appropriate public education (FAPE) under IDEA."  (Id. ¶¶ 2-3.)  This action also seeks "compensatory damages for discrimination against BD based on his disabilities, discrimination

---

[2]  The Hearing Officer Decision is Exhibit A to Plaintiffs' complaint.  (Doc. No. 3.)

against BD based on his race, and common law torts, all arising in connection with BD's schooling within the District."  (Id. ¶ 4.)

BD was adopted from Ethiopia as an infant and has suffered from "a number of chronic and acute medical conditions over the years that have required ongoing treatment, including cancer (currently in partial remission) and an epileptic disorder, which causes frequent seizures, all [of] which have and continue to have a negative impact on his overall success at school."  (Id. ¶ 45.)  BD has also been diagnosed with hypoglycemia, Russell Silver Syndrome, and Beckwith-Wiedemann Syndrome, and was treated for "complex-partial seizures the first four years of his life, however his epileptic seizure disorder returned in 2017 and has continued."  (Id. ¶ 46.)  Plaintiffs assert that BD's seizures can occur multiple times throughout the day and "manifest[] by BD lacking his awareness and ability to understand what is happening in his environment, as well as up to 20 minutes delay cognitively post seizure where BD is unable to absorb information and resume normal activities and cognitive functioning."  (Id. ¶ 47.)  Defendant initially classified BD in regard to three disabilities:  Wilms Tumor, Ketonic Hypoglycemia, and Fine Motor Delay.  (Id. ¶ 48.)

Plaintiffs assert that BD was evaluated by the Lancaster-Lebanon Intermediate Unit (Unit 13) initially in the spring of 2013, and an evaluation report was issued in September 2013 by Defendant.  (Id. ¶ 49.)  That report determined that BD had developmental delays in the following areas: attention/memory, reasoning/academic skills, and perceptions/concepts, and noted that his score was "greatly impacted by his attention/focus and willingness to attempt required tasks."  (Id.)  The report found BD eligible for special education services; specifically, special education early intervention ("EI") services under the IDEA in the area of cognitive development to address his attention to tasks and following directions.  (Id.)  BD received an EI

Individualized Education Plan ("IEP") in April 2013 and received EI services prior to entering kindergarten.  (Id. ¶ 50.)

Plaintiffs assert that CLSD enrolled BD in kindergarten without implementing his IEP, alleging that "CLSD made the decision not to accept [BD] as a child eligible for special education services even before conducting an evaluation or discussing options with the Parents," and that "Parents testified [in the administrative proceeding] that they wanted BD to remain eligible for special education and to maintain his IEP upon entry into kindergarten, but parents were not provided with any other options other than a reevaluation."  (Id. ¶ 52.)  Plaintiffs further assert that "[t]he decision to not implement BD's IEP was, therefore, based on the District's practice of not implementing EI IEPs."  (Id.)  Plaintiffs allege that CLSD's elementary school psychologist Phillip Rader ("Mr. Rader") testified in the administrative proceeding that he did not know whether the parents were able to waive reevaluation from EI to school age and create a new IEP, and that he further "testified that 'we would typically not just simply implement an early intervention IEP.'" (Id. ¶¶ 54-55.)

In May 2013 CLSD conducted a reevaluation of BD, and between May and September 2013, when the Reevaluation Report was issued, CLSD did not implement any of BD's EI IEP services.  (Id. ¶¶ 57-58.)  Plaintiffs allege that the Reevaluation Report was flawed in several respects, inasmuch as the CLSD "did not administer all of the subtests of the WPPSI [Wechsler Preschool and Primary Scale of Intelligence] for the September 2013 [report] or obtain a Full Scale IQ" and that "[d]espite Mr. Rader's knowledge of BD's eligibility for special education services in the area of cognitive development, the Reevaluation did not formally assess these underlying weaknesses, identified in the review of the Early Intervention findings, as impacting his cognitive and behavioral performance," and further, that "[i]n making his eligibility

determination, Mr. Rader also inaccurately claimed that there was no evidence that [BD's] health conditions adversely affected his educational performance." (Id. ¶¶ 60-63.) Plaintiffs assert that "[n]othing prevented the District from appropriately executing BD's EI IEP," but that despite the District's alleged obligation to do so, CLSD "stripped BD of his status as a student with a disability and then re-evaluated him without the test that related to and addressed his EI disability," ultimately concluding that BD was not eligible for an IEP. (Id. ¶¶ 65-67.) Plaintiffs allege that "[t]he Parents did not agree with the District's determination that [BD] was ineligible for special education services," but "were told that their options were to accept a 504 plan or go without any services at all." (Id. ¶ 68.)

Plaintiffs assert that while "[t]he District maintains that it developed a Section 504 Plan for [BD] in kindergarten," "no staff member has been able to locate the document" and "Parent has no recollection of its existence." (Id. ¶ 69.) Plaintiffs assert that "[a]ccording to the District, the Section 504 Plan developed for [BD] in Fall 2013 provided for occupational therapy, accommodations in fine motor skill weaknesses, and [BD's] access to the nurse, as needed, for medical reasons"; in addition, that 504 Plan "called for medical emergencies to be handled with a procedure that began with a call to 911." (Id. ¶¶ 70, 72.) Plaintiffs assert that the 504 Plan "referenced an Individual Health Plan (IHP), but none was provided to Parents at that time." (Id. ¶ 72.) Plaintiffs assert that "[d]espite their misgivings about the safety aspects of the District's plan, and its adequacy generally, Parents indicated general agreement with the Section 504 Plan as presented." (Id. ¶ 73.) Plaintiffs allege that during first and second grade, BD's occupational therapist and teacher noted that he had difficulty staying on task, while "Parent's requests for an IEP continued to be ignored." (Id. ¶ 74.)

Plaintiffs assert that "[i]n the fall of 2017, the District developed another Section 504 Plan, providing for occupational therapy, accommodations for fine motor skill weaknesses, a visual schedule, preferential seating, prompts to check work, end of day check-ins, and Student's access to nurse, as needed, for medical reasons," and that "[t]here was one goal for maintaining focus and attention and one for organizing materials," and that "[a]lthough the District was noticing that BD's needs were more involved, they added on to the 504 Plan and allocated the duty of remediating even more of Student's deficits to the [occupational therapist] instead of a special education teacher."  (Id. ¶ 76.)  Plaintiffs note that, "[a]s before, medical emergencies would be handled with a procedure beginning with calling 911, and the Plan referenced an IHP, but none was attached."  (Id. ¶ 77.)

Plaintiffs assert that during the 2017-2018 school year (which was BD's fourth grade year), BD scored in the "basic" range in English/Language Arts and the "below basic" range in mathematics and science on the Pennsylvania System of School Assessment ("PSSA") testing, and that in the spring of 2018, Parents requested in writing that CLSD conduct a reevaluation of BD because they were particularly concerned about the possibility that BD might have a learning disability.  (Id. ¶¶ 79-80.)  In October 2018 CLSD completed a reevaluation of BD as requested by Parents, and Plaintiffs assert that "[t]eacher input into the Reevaluation Report reported BD's difficulties with multiple-step-directions, maintaining attention to tasks, processing information, and demonstrating organizational skills."  (Id. ¶¶ 81-82.)  Plaintiffs allege that "[a]lthough the cognitive assessment for the October 2018 RR (Wechsler Intelligence Scale for Children – Fifth Edition (WISC-V) yielded Full Scale IQ in the average range, with a relative weakness in fluid reasoning (low average range), the Full Scale IQ from the October 2018 RR is of only limited utility because the District did not administer all of the WISC-V subtests for the Reevaluation,"

as "Mr. Rader only performed 2 of the 7 tests instead of administering the full battery," and that "[n]either of those tests were cognitive development tests."  (Id. ¶ 83.)  The Reevaluation showed that BD was performing below grade level in math and that his math PSSA scores were "below basic."  (Id. ¶ 84.)  Plaintiffs maintain that based on the Reevaluation Report, CLSD "determined that [BD] was not eligible for special education, but instead continued to add items to the 504 Plan," including recommended "continued [occupational therapy] and writing supports, accommodations for attention and organization, checks for understanding, preferential seating, and end-of-day check-ins."  (Id. ¶ 86.)

Plaintiffs further allege that, in June 2019, after BD's fifth grade year, BD was seen at CHOP for a neurological assessment, which resulted in the preparation of a report (the "CHOP Report"), which "noted that '[BD] struggles to master new concepts in math and reading. . . . [BD] is allowed to take completed tests home to fix his mistakes and errors, resulting in his parents spending additional time working with him in the evenings,'" and "observed that 'when examining his PSSA scores from 3rd to 4th grade, [BD] appears to have already begun falling behind academically.'"  (Id. ¶¶ 88-89.)  The CHOP Report diagnosed BD with "Attention Deficit/Hyperactivity Disorder (ADHD), Developmental Coordination Disorder, and Adjustment Disorder with mixed anxiety and depressed mood," and recommended that BD receive special education services by way of an IEP, as follows:

> [a]lthough [BD] performed broadly within grade expectations and within the general average range for age on academic tasks, [BD] nonetheless remains at risk for falling behind academically. . . . Given his constellation of attention, executive functioning, and memory weakness, [BD] is at high risk for falling behind academically. . . . Given these findings, [BD] should receive individualized supports for his academics through an Individualized Education Program, and his teachers and parents should continue to monitor his academic progress to prevent additional delays.

(Id. ¶¶ 90-91.)

7

Following Parents' multiple requests for an IEP, CLSD evaluated BD in November 2019, and found him eligible for special education services in the areas of speech and language.  (Id. ¶ 92.)  The October 25, 2019 Evaluation Report ("2019 Evaluation Report") was prepared by Kimberlee Fleming, CLSD's speech and language therapist, and "confirmed many of the problems that Parents had previously been identifying to [CLSD], particularly with regard to BD's emotional and social deficits."  (Id. ¶ 93.)  Plaintiffs allege that the 2019 Evaluation Report "noted issues with BD's initiating social communication, topic maintenance in conversation, providing spontaneous information, and non-verbal signs with peers.  He also scored in the borderline impaired/delayed range in processing and response time, making inferences, problem solving, social interaction and social interpretation in the social language development test."  (Id. ¶ 94.)  The 2019 Evaluation Report documents "an observation of BD in unstructured time and found that BD struggled to interact with other peers, 'group up' or participate with others, and interact appropriately."  (Id. ¶ 96.)  Plaintiffs allege that during recess, "BD walked into the school with the other students without talking to, or interacting with, them.  It was noted that, when he ran, he moved his head from side to side in a swinging motion."  (Id. ¶ 97.)  The 2019 Evaluation Report found that "BD is not able to problem solve in dynamic situations with peers because he does not understand what they are thinking or feeling and cannot take their perspective in a given situation," and noted that BD's gym teacher "described BD as a follower in gym class and as a 'clingy' student."  (Id. ¶¶ 98-99.)  Plaintiffs allege that the 2019 Evaluation Report's ultimate finding was that BD "was eligible for an IEP based on social pragmatic communication disorder."  (Id. ¶ 100.)

Plaintiffs also allege that in October 2018, Parents informed CLSD that BD had been diagnosed with "absence seizures," which he experiences daily, and often occur when he is

sitting at his desk in the classroom.  (Id. ¶ 105.)  Plaintiffs allege that while "[t]he school nurse provided general brochures to the teachers about absence seizures in the Fall of 2018," she "never provided any training to BD's teachers or other staff in responding to BD's seizures." (Id. ¶ 106.)  The CHOP Report "describes the seizures as 'staring spells that included speech arrest (i.e., stopping speaking in mid-conversation) and then a startle after a few seconds,'" and "also note[s] that '[BD] also complained of headaches and confusion after episodes.'"  (Id. ¶ 107.)  The CHOP Report states that Parents reported 5-6 spells a day, which were noticed at school.  (Id.)  Plaintiffs assert that: "[BD] completely loses his memory of events during the seizures"; his "physician advises that it takes [BD] 20 minutes to become cognitively aware of his surroundings following a seizure"; and "[BD] misses significant amounts of time in class on account of his seizures, and he is not receiving adequate support in school to make up for that time missed."  (Id. ¶¶ 108-110.)  Plaintiffs assert that "[o]n October 1, 2018, Parent, JD, emailed Mr. Rader, the School Psychologist at the time, '[d]ue to the loss of information in the classroom we are having to re-teach [BD] his lessons at home and he is losing valuable free time needed for decompression at home.'"  (Id. ¶ 112.)  Plaintiffs allege that "[BD]'s seizures are not always easy to identify," noting that "BD has received positive feedback from teachers when he 'focuses' on the teacher and keeps looking ahead during lessons," but that "[t]his perceived 'focus,' though credited as better attention, may instead indicate the occurrence of a seizure," and if so, "BD is not processing any information during such an incident."  (Id. ¶ 113.)

Plaintiffs allege that "[t]eachers and [CLSD] were made aware of the seizures in Spring 2018," and that Parents emailed BD's teachers "to inform them that, during his neurology appointment, 'BD on EEG was having about six seizures in half an hour'", which Parents described as "'a significant amount when we think about it in terms of him trying to complete a

half hour of school work or complete tasks that require complex or multiple steps.'" (Id. ¶ 114.) Plaintiffs allege that, in May 2018, they emailed two individuals at CLSD about BD's performance at school, stating that they "[were] concerned [BD] was missing critical material and requested that he would get additional assistance outside of school." (Id. ¶ 116.) Plaintiffs further assert that in September 2018, Parents emailed Mr. Rader at CLSD regarding BD's performance in math, stating that "[BD] is struggling terribly with math and brought [Parents] 3 quizzes in which he only got one answer correct," and that "[w]e have been spending all evening each day re-teaching math." (Id. ¶ 117.) Plaintiffs allege that "[CLSD]'s Director of Elementary Education, Dr. Tracie Clemens, acknowledged during a January 2019 special education meeting with Parents that BD was '[e]ntirely behind in math' and that 'Parents may want to look into private schooling, as [CLSD] may not be able to meet his needs.'" (Id. ¶ 118.) Plaintiffs allege that [CLSD] never implemented individualized math support for B.D. (Id. ¶ 120.)

Plaintiffs assert that BD's weak fine motor skills and hyperactivity "have continued to cause him significant difficulties in the classroom." (Id. ¶ 121.) Specifically, Plaintiffs allege that BD's hyperactivity has been documented in science class, describing an incident that occurred in October 2018, when "BD was singing to himself quietly in class, which is one of his coping mechanisms when experiencing stress," when his teacher "called on him to read aloud and BD responded 'I can't'", beginning to sing again, after which his teacher sent him to the hallway for the remainder of the activity. (Id. ¶¶ 124-125.) Plaintiffs allege that "BD has become embarrassed about his performance in school and it has diminished his self-esteem." (Id. ¶ 126.)

Plaintiffs further assert that BD's individual health plans ("IHPs") have not been followed, noting that those plans have stated that BD "must have an escort for any trip to the

school nurse," and that "staff should call an ambulance if needed."  (Id. ¶ 127.)  Plaintiffs allege

that while the [CLSD] nurse created seizure action plans to distribute to teachers, "those action

plans contained incorrect information and were never presented to Parents," asserting that, when

they reviewed BD's seizure action plans during the administrative proceeding, "[t]he

symptomology set out in [CLSD]'s documents relating to his seizures was inaccurate and

resulted in his absence seizures going unaddressed in classes for years."  (Id. ¶ 128.)  Plaintiffs

assert that, during the administrative proceeding, the school nurse testified and listed symptoms

that teachers should look for in order to identify BD's seizures; however, "[n]ot one of those

symptoms appeared in the most up-to-date plan then in use at BD's school."  (Id. ¶ 129.)

Plaintiffs further allege that "[f]ew of BD's nurse visits, seizures, or doctor's notes are

recorded or indexed in BD's education records held by the District," and that "[w]hen the nurse

was asked whether it made sense that there was no documentation from physicians in BD's

education records, she responded 'No.'"  (Id. ¶ 130.)  Plaintiffs assert that no ambulance has ever

been called by CLSD in relation to BD's seizures.  (Id. ¶ 131.)  Plaintiffs allege that on February

24, 2020, BD suffered a seizure in class, reporting "that 'everything went black' and then he

eventually was sent to the nurse without an escort," but that "[n]o incident report was provided to

Parent until months after Parent's counsel requested it from [CLSD]."  (Id. ¶ 132.)   Plaintiffs

further assert that, in some cases, BD's seizure and health plans have not even been provided to

relevant personnel, alleging that, during the administrative proceeding, the testimony of

[CLSD]'s speech and language therapist revealed that she was unaware that symptoms that she

witnessed in BD were symptoms associated with his seizures, and that, "had she known, she

'would have notified the nurse' when she saw those symptoms."  (Id. ¶ 133.)  Plaintiffs assert

that [CLSD]'s "failure to program for BD's seizure disorder and make necessary

accommodations prevents him from accessing his education in a regular education setting." (Id. ¶ 135.)

Plaintiffs also allege that BD has been subjected to bullying at school by his peers, based on his race and his disabilities, and that "[t]he bullying became more pervasive and outrageous beginning with [BD]'s fifth grade year (2018-19)." (Id. ¶ 136.) Plaintiffs assert that BD "was called names based on his race and academic deficits," stating that, in September 2018, BD's teacher asked the students to trade their completed tests and peer grade them, and that when another student, XY, finished grading BD's test, XY "openly mocked and ridiculed BD for his failing grade on the assignment." (Id. ¶ 137.) Plaintiffs allege that XY "frequently called [BD] 'dumb' or 'retarded' when [BD] struggled with an in-class assignment." (Id. ¶ 138.) Plaintiffs assert that, after the peer grading incident, in the fall of 2018, Parents informed [CLSD] about the incident and "made [CLSD] aware of the continuing bullying by XY," which prompted a November 2018 meeting between Parents and [CLSD] to address the situation. (Id. ¶¶ 139-140.) Plaintiffs assert that, at that meeting, "Parents were informed that BD would have to stay home from school for the two days following the meeting while administration determined a better way to address the bullying," and the [CLSD] middle school principal told them "'[w]e can't keep him safe.'" (Id. ¶ 140.) Plaintiffs allege that XY's bullying of BD continued, and that in September of 2019, "XY passed BD in the hallway and called him a 'faggot'"; Parents thereafter reported the incident to CLSD. (Id. ¶ 142.) Plaintiffs assert that "[s]chool staff reviewed the hallway security footage and confirmed that XY had passed BD in the hallway and said 'something' to BD, but there was no further investigation." (Id. ¶ 143.)

Plaintiffs assert that [CLSD] "adjusted BD's 504 Plan to state that BD must stay away from the bully, thereby putting the onus on BD to avoid XY"; further, they allege that "XY used

the required separation of the two students as a device to further bully BD" because "[o]n more than one occasion, XY moved his seat at lunch to get closer to BD and his companions so that BD would be forced to leave his chosen lunch table."  (Id. ¶ 145.)  Plaintiffs allege that Parents informed CLSD of these incidents, which continued and "[t]hese incidents were witnessed by several teachers, who did not take any corrective action."  (Id. ¶¶ 145-146.)

Plaintiffs assert that "XY's bulling of BD continued throughout the Fall semester of 2019-20, escal[a]ting to the point where XY called BD a 'n-word' on several occasions."  (Id. ¶ 148.)  Plaintiffs allege that after one incident where XY used this word on the bus, Parent J.D. "immediately drove to the school to report the incident to administrators," but "[n]o report for this incident was documented by [CLSD]."  (Id. ¶ 149.)  CLSD's middle school principal testified at the administrative proceeding that "there were no black teachers at the school, no black administrators, and 'ten to fifteen maybe' black students in the school, out of a total enrollment of about 550."  (Id. ¶ 150.)  Testimony at the administrative proceeding also confirmed that Parents "not only offered to organize a racial sensitivity training for [CLSD] employees but offered to pay for it as well"; however, CLSD's middle school principal testified that CLSD "has never acted on Parent's offer because during his time at the District there have been no assemblies devoted specifically to diversity or racial sensitivity."  (Id. ¶ 151.)  Plaintiffs assert that "BD endured racially hostile experiences both in and out of the classroom," stating that he "endured racial insensitivity during his classes where his class read and discussed an article titled, '[r]ich whites and poor students of color more and more separated in schools,'" which "made BD feel isolated from his peers."  (Id. ¶ 153.)

Plaintiffs allege that CLSD "has had a pattern of arguing that race had nothing to do with [BD]'s experience, but it has so much to do with BD's experience as a student with a disability

and as a minority in the District," and that "[a]s a student with low self-concept and emotional struggles, the in-class and out-of-class racial discrimination and bullying has had a profound and negative impact on [BD]'s education."  (Id. ¶¶ 155, 157.)  Plaintiffs describe one incident of the bullying BD was subjected to as follows: "[o]ne incident of XY's intentional harassment of BD followed the disclosure that BD had performed poorly on a spelling test.  After school XY followed BD to the bus, openly calling BD 'faggot' and 'retarded' within the hearing of other students."  (Id. ¶ 158.)  Plaintiffs assert that they informed CLSD administrators of this harassment, but "no Individual Safety Plan was created to protect BD from bullying," and that CLSD's "purported solution for the bullying by XY included, among other things, requiring one of the Parents to attend field trips and 'unstructured' school activities if BD planned to participate."  (Id. ¶¶ 159-160.)  Plaintiffs assert that BD's 504 Plan from this time period indicated that BD should be separated from XY, stating that "[i]f BD seeks out this boy, he will be told to keep away from him," which Parents maintain improperly purported to restrict BD's behaviors rather than those of XY;  further, Parents assert that their requests to CLSD to change the 504 Plan were rebuffed, and "XY continued to use the restrictions imposed by the District as a tool to harass and bully BD, by approaching him and thereby distancing him from his peers." (Id. ¶¶ 161-163.)

Plaintiffs allege that, on May 10, 2019, BD was "pushed from his seat by XY while in Ms. Amanda Matarazzi's class," but CLSD did not inform Parents of this incident, which they became aware of when BD informed them after school.  (Id. ¶ 164.)  After communicating with the principal of BD's school regarding the incident, Plaintiffs assert that he informed them that that a safety plan would be sent to BD's teachers.  (Id. ¶ 165.)  Plaintiffs assert that the safety plan shared with them "proposed to punish BD for being bullied by, among other things,

requiring BD to be removed from recess and lunch with his peers, thereby placing the burden of safety on the bullied child, rather than directly addressing the threat facing him." (Id. ¶ 166.) On May 19, 2019, Parents informed BD's principal that "they believed BD was not safe at school, and that BD would therefore not return unless a safety plan were developed." (Id. ¶ 167.)

Plaintiffs assert that on July 16, 2019, a meeting was held among Parents, District Representative Dr. Michael Robinson, and then-Head of Special Education, Sarah Schaefer, at which time Parents "again requested that a comprehensive safety plan be provided for their son upon matriculation to Cedar Crest Middle School," offering a template for a formal safety plan to CLSD. (Id. ¶ 168.) Plaintiffs further assert that CLSD denied their request for a formal safety plan, and informed them that, while BD was attending the middle school, "in lieu of a written safety plan for BD, BD and XY would be given different schedules and assigned different areas of the building for recess and lunch." (Id. ¶ 169.) Plaintiffs allege that "[a]s a result of the District's refusal to program for BD's safety in the manner required by law and regulation, BD has been excluded from school since that meeting." (Id. ¶ 170.) Plaintiffs allege that CLSD had a "pattern and practice of not documenting incidents of bullying of BD," maintaining that "the lack of documentation, especially for incidents regarding racial slurs, along with the number of incidents that BD suffered, is directly indicative of the improper handling of bullying in relation to BD." (Id. ¶¶ 171, 173.)

Plaintiff additionally allege that the bullying of BD by XY, and CLSD's "lack of appropriate educational programming" resulted in the situation where BD began "expressing suicidal thoughts, causing Parents to seek outside medical evaluations and treatment." (Id. ¶ 176.) Plaintiffs cite to the CHOP Report's finding that:

> [Student] reported one event in April in which he considered cutting his wrists
> with a kitchen knife.  At that time, he felt hopeless in regard to his academics,
> particularly in regards to a math test on which he had significantly struggled.

(Id. ¶ 177.)  Plaintiffs assert that the CHOP Report also noted that BD continues to have

"suicidal ideations" related to his poor performance at school.  (Id. ¶ 178.)  Plaintiffs assert that

BD's treating psychologist at CHOP created a Suicide Safety Plan for BD, which outlines the

"warning signs of BD's suicidal ideations," which include "math tests, conflicts during

basketball, and conflicts with peers – all activities that occur during the school day."  (Id. ¶¶ 180-

181.)

Plaintiffs allege that they made CLSD's elementary school psychologist, Mr. Rader,

aware of the Suicide Safety Plan;  however, he did not make a copy for BD's file, instead

"pass[ing] it back to Parent and ask[ing], 'What do you want me to do with this?'" (Id. ¶¶ 181,

183.)  Plaintiffs assert that, despite Mr. Rader's assurance that he would inform the relevant staff

about the situation, "it is apparent that the information was lost during BD's transition to middle

school, as the new school psychologist at the Middle School was not aware."  (Id. ¶ 182.)

Plaintiffs allege that Dr. Greenawalt, the middle school psychologist, reviewed the CHOP Report

in October 2019 and therefore learned about BD's suicidal ideations, but he did not make any

program changes or recommendations.  (Id. ¶ 184.)  Plaintiffs assert that "the District added no

supports to BD's program for his emotional deficits."  (Id. ¶ 186.)

BD continued to struggle at the middle school.  In approximately the middle of the 2019-

2020 school year (BD's sixth grade year), Parents filed a due process complaint against CLSD,

alleging that it denied BD a FAPE under the IDEA, Section 504 of the Rehabilitation Act of

1973, and the Americans with Disabilities Act ("ADA"), and the case proceeded to a hearing.

(Doc. No. 3 at 2.)  In the decision issued after the hearing, the Hearing Officer granted in part

and denied in part the Parents' claims, finding that:

1.  The Parents' claims prior to January 2018 are barred by the statute of limitations.

2.  The District did deny Student FAPE relating to Student's seizure disorder during the 2018-19 school[] year from the date of the November 2018 Section 504 Plan through the end of the school year, and from the start of the 2019-2020 school year through the date of the COVID-19 school closures.  The District did not deny Student FAPE procedurally or substantively in any other respect.

3.  Student is awarded one (1) hour of compensatory education for each week identified in ¶ 2 hereof in order to remedy the denial of FAPE.  All of the conditions and limitations on that aware set forth above are expressly made a part hereof as though set forth at length.

4.  The District shall convene a meeting of Student's IEP team to include the Parents within ten calendar days of the date of this order to develop a new IEP for Student that includes at a minimum, all of the following: weekly school-based counseling; access to a school counselor, emotional support teacher, or other trusted adult throughout the school day as needed; a revised IHP; annual training at the beginning of each school year in which Student is enrolled in the District on absence seizures of all staff in Student's school building by an experienced school nurse; and a process for documenting in writing all occurrences of absence seizures by Student and promptly communicating same to the Parents.

5.  Within thirty calendar days after receipt of all invoices and/or receipts for the IEE issued in February 2020 by the private psychologist, the District shall reimburse the Parents for the entire cost.

6.  Nothing in this Order should be read to prevent the parties from mutually agreeing to alter any of its terms.

It is further ordered that any claims not specifically addressed by this decision and order are DENIED and DISMISSED.

(Doc. No. 3 at 39-40.)  Accordingly, the Hearing Officer Decision found that CLSD denied BD a

FAPE relating to his seizure disorder during the 2018-2019 school year from the date of the

November 2018 Section 504 Plan through the end of the school year, and from the start of the

2019-2020 school year through the date of the COVID-19 school closures, but "did not deny

Student FAPE procedurally or substantively in any other respect."  (Id.)

Plaintiffs assert that, with regard to counseling for BD, CLSD "made no mention of counseling in any of BD's IEPs until midway through the due process hearing in April 2020," and then "the District only added the option of a weekly 'check-in' with a counselor – despite the Parent's request at the meeting for more consistent and thorough counseling sessions," refusing to "add counseling as a related service despite BD's significant social and emotional struggles." (Doc. No. 1 ¶ 190.)  Plaintiffs note that the Hearing Officer Decision required CLSD to "develop a new IEP for Student that includes, at a minimum, all of the following:  weekly school-based counseling; access to a school counselor, emotional support teacher, or other trusted adult throughout the school day as needed . . ."  (Id. ¶ 191.)  Plaintiffs allege that "[i]nstead of adding a weekly counseling session to the services in BD's IEP, as indicated by the Hearing Officer, the District revised slightly the Specially Designed Instruction (SDI) already in his IEP, providing for a weekly 'check-in' with a counselor, to read as follows:

> School Counselor will check-in with BD on a weekly basis to asses[s] BD's social/emotional well-being[] and the frequency is being change[d] from 'One time per week when school is in session' to 'One time per week; at least 15 minutes and up to 30 minutes; when school is in session.'"

(Id. ¶ 193.)  Plaintiffs assert that "[i]t is patently clear in the HO Decision that the Hearing Officer was mandating the addition of counseling services to Student's IEP because the next, discrete item in her order is 'access to a school counselor, emotional support teacher, or other trusted adult,' a clear reference to a counselor 'check-in.'"  (Id. ¶ 194.)

Plaintiffs allege that CLSD "deliberately ignored the clear mandate in the HO Decision," and that CLSD representatives at BD's September 4, 2020 IEP meeting "insisted that they would not add counseling as a related service in BD's IEP."  (Id. ¶ 195.)  Plaintiffs allege that, following their receipt of the September 4, 2020 IEP, Parents submitted a document to CLSD "in which Parents offered their view of the specific ways in which the IEP was not appropriate for

BD's needs, and the ways in which the IHP was still inaccurate; BD's own input; and their complaint about the District's failure to comply with the HO Decision."  (Id. ¶ 196.)  Plaintiffs maintain that despite this input, CLSD has "refused to amend the IEP to reflect any of Parents' concerns," and assert that "the current, most up-to-date revised Individualized Health Plan for BD still contains materially inaccurate information about BD's seizure condition and symptomatology, and even an incorrect identification of BD's physician," reflecting that "despite multiple meetings and detailed pages of information sent to [CLSD], [CLSD]'s documents are still inaccurate and highlight [CLSD]'s inability to program for BD."  (Id. ¶¶ 197, 199-200.)

On October 20, 2020, Plaintiffs filed their complaint in this Court alleging nine causes of action against CLSD: Denial of FAPE under IDEA and Section 504 (Count I); Award of Attorneys' Fees, Expert Fees and Costs under IDEA and Section 504 (Count II); Discrimination Based on Disability Under Section 504 and PA Chapter 15 (Count III); Discrimination On the Basis of Disability Under Title II of the ADA (Count IV); Disability Harassment Under Section 504 and Title II (Count V); Discrimination On the Basis of a Racially Hostile Environment Under Title VI of the Civil Rights Act of 1964 (Count VI); Action Under 42 U.S.C. §1983 for Unlawful Deprivation of Federal Rights Secured by § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Count VII); Failure to Comply with the HO Decision (Count VIII); and Intentional Infliction of Emotional Distress (Count IX).  (Doc. No. 1.)  On October 27, 2020, as noted above, Plaintiffs filed four sealed Exhibits to the complaint.  (Doc. No. 3.)  On November 13, 2020, the Administrative Record from the Office of Dispute Resolution was filed with the Court.  (Doc. No. 6.)

On December 29, 2020, CLSD filed the instant partial motion to dismiss, which challenges whether six counts of the complaint, Counts III-VII and IX, state a claim upon which

relief may be granted.  (Doc. No. 7.)  In particular, Defendant's motion challenges the counts of

the complaint alleging disability and race discrimination, as well as Plaintiffs' claim for

intentional infliction of emotional distress.[3]  Defendant filed a brief in support of its partial

motion to dismiss on December 30, 2020 (Doc. No. 8), and Plaintiffs filed a brief in opposition

to Defendant's brief on January 12, 2021.  The time for the filing of a reply brief having passed,

Defendant's motion is ripe for disposition.

## II.    LEGAL STANDARD

Federal notice and pleading rules require the complaint to provide the defendant notice of

the claim and the grounds upon which it rests.  See Phillips v. Cty. of Allegheny, 515 F.3d 224,

232 (3d. Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a

plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure

8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled

to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure

12(b)(6) for its "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P.

12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all

factual allegations in the complaint and all reasonable inferences that can be drawn from them,

viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618

F.3d 300, 314 (3d Cir. 2010).  The Court's inquiry is guided by the standards of Bell Atlantic

Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009).  Under

Twombly and Iqbal, pleading requirements have shifted to a "more heightened form of

---

[3]  CLSD's partial motion to dismiss does not challenge Plaintiffs': claim for denial of FAPE under IDEA and Section 504 (Count I); claim for attorneys' fees, expert fees and costs under IDEA and Section 504 (Count II); and claim for failure to comply with the Hearing Officer Decision (Count VIII).

pleading."  See <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009).  To prevent

dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is

facially plausible.  See <u>id.</u>  The plausibility standard requires more than a mere possibility that

the defendant is liable for the alleged misconduct.  As the Supreme Court instructed in <u>Iqbal</u>,

"where the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to

relief.'"  See <u>Iqbal</u>, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, to determine the sufficiency of a complaint under <u>Twombly</u> and <u>Iqbal</u>, the

United States Court of Appeals for the Third Circuit has identified the following steps a district

court must take when determining the sufficiency of a complaint under Rule 12(b)(6):  (1)

identify the elements a plaintiff must plead to state a claim;  (2) identify any conclusory

allegations contained in the complaint "not entitled" to the assumption of truth;  and (3)

determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly

give rise to an entitlement to relief."  See <u>Santiago v. Warminster Twp.</u>, 629 F.3d 121, 130 (3d

Cir. 2010) (citation and quotation marks omitted).

In ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must

consider only the complaint, exhibits attached to the complaint, matters of public record, as well

as undisputedly authentic documents if the complainant's claims are based upon these

documents."  See <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010) (citing <u>Pension Benefit</u>

<u>Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).  A court may

also consider "any 'matters incorporated by reference or integral to the claim, items subject to

judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'"

See Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004)).

## III.    DISCUSSION

By way of background, the Court notes that the IDEA conditions a state's receipt of federal funding for special education programs upon its use of "policies and procedures to ensure that . . . [a] free appropriate public education is available to all children with disabilities . . . ." See 20 U.S.C. § 1412(a)(1)(A).  A free appropriate public education, or "FAPE," "'consists of education instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child "to benefit" from the instruction.'"  See W.B. v. Matula, 67 F.3d 484, 491 (3d Cir. 1995) (quoting Bd. Of Educ. v. Rowley, 458 U.S. 176, 188-89 (1982)), abrogated on other grounds by A.W. v. Jersey City Public Schools, 486 F.3d 791 (3d Cir. 2007).  This generally occurs through the creation of an Individual Education Plan ("IEP"), for each disabled child, which "consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goal for the child's education and specifying the services the child will receive."  See Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 173 (3d Cir. 1988), cert. denied, 488 U.S. 1030 (1989).

The IDEA provides a variety of procedural rights to parents of disabled children, including the following: they "may examine all relevant records concerning evaluation and placement of their children"; "must receive prior written notice when a school proposes or refuses to alter a placement"; "may contest in an impartial due process hearing decisions regarding the evaluation of their child or the appropriateness of the child's program"; "may appeal the decision from such a hearing to the state education agency'" and "may obtain judicial

review of the administrative decision." See Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d

Cir. 1995) (quoting 20 U.S.C. § 1415)).  This case involves review of such an administrative

decision,[4] as well as other constitutional and state law claims.

As noted above, Defendant has moved to dismiss Plaintiffs' claims of disability

discrimination (Counts III and IV), disability harassment (Count V), racial discrimination

(Counts VI and VII), and intentional infliction of emotional distress (Count IX).  The Court first

addresses Plaintiffs' claims of disability discrimination.

### A.   Disability Discrimination Under Section 504 and Title II of the ADA (Counts III and IV)

#### 1.   Legal Standard

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from the participation in, be denied the benefits of, or be subjected to discrimination

under any program or activity receiving Federal financial assistance . . . ."  See 29 U.S.C. §

794(a).  Section 202 of the ADA provides similarly that "no qualified individual with a disability

shall, by reason of such disability, be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to discrimination by any

such entity."  See 42 U.S.C. § 12132.  The ADA "extends the nondiscrimination rule of Section

---

[4] The Third Circuit discussed the appropriate weight to be given to an administrative decision under the IDEA in Andrew M. v. Delaware County Office of Mental Health and Mental Retardation, 490 F.3d 537 (3d Cir. 2007).  The Third Circuit stated that "the party challenging an administrative decision faces the additional hurdle of overcoming a presumption that the Hearing Officer's findings were correct," and that "[a]lthough a district court may make its own findings of fact by a preponderance of the evidence and look at evidence outside the administrative record, it is required to give the administrative decision 'due weight.'"  See id. at 545 (citations and quotations omitted).  "Under this standard, '[f]actual findings from the administrative proceedings are to be considered prima facie correct,' and '[i]f a reviewing court fails to adhere to them, it is obliged to explain why.'"  See id. (citations and quotations omitted).

504 of the Rehabilitation Act to services provided by any 'public entity' without regard to whether the entity is a recipient of federal funds.  See Jeremy H. by Hunter v. Mount Lebanon Sch. Dist., 95 F.3d 272, 279 (3d Cir. 1996).

Accordingly, "[t]he same standards govern both the RA and the ADA claims."  See S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 260 (3d Cir. 2013).  To maintain a cause of action under the RA and the ADA, a plaintiff must demonstrate that a child "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability."  See id.  A plaintiff does not need to prove that the discrimination was intentional to establish liability.  See id. at 262.  However, in order to recover compensatory damages under Section 504, a plaintiff must demonstrate intentional discrimination.  See Durrell, 729 F.3d at 262.  The Third Circuit has established a deliberate indifference standard for intentional discrimination, requiring a demonstration of "(1) knowledge that a federally protected right is substantially likely to be violated . . . and (2) failure to act despite that knowledge."  See id. at 265 (emphasis in original).  "Knowledge" under this standard must be actual knowledge and is not satisfied by claims that school officials "should have known."  See D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 270 (3d Cir. 2014).

### 2.        Arguments of the Parties

In moving to dismiss Plaintiffs' claims of disability discrimination, Defendant notes that Plaintiffs' complaint alleges disability discrimination in violation of Section 504 based on CLSD's failure to provide BD with (1) an adequate written medical safety plan with regard to his seizures; (2) a safety plan and adequate interventions in relation to his complaints of bullying; (3) emotional support in the form of counseling; and (4) "other necessary supports and

accommodations for his safety and education." (Doc. No. 1 ¶¶ 227-232.) In maintaining that Plaintiffs' complaint fails to state a claim for disability discrimination under Section 504 or the ADA, Defendant initially argues that this claim should be dismissed because "disability discrimination was alleged at the administrative level and the Hearing Officer found no such discrimination." (Doc. No. 8 at 12.) Second, Defendant asserts that the complaint's allegations that CLSD's Section 504 service agreements and IEPs failed to provide adequate educational support to BD "is insufficient to establish disability discrimination," and that Plaintiffs' complaint does not allege intentional discrimination as necessary to support a claim for compensatory damages, because "the majority of the factual allegations center on failing to provide sufficient supports and accommodations, or by failing to act to curb other students' bullying conduct." (Id.)

In response, Plaintiffs initially maintain that Defendant mischaracterizes the Hearing Officer's decision in stating that she found no discrimination based on disability, asserting that she "merely stated that any claims that Student suffered discrimination, not sounding in the denial of FAPE under the IDEA, are beyond the competence of the independent hearing officer in a state due process proceeding." (Doc. No. 10 at 6.) With regard to Defendant's argument that Plaintiffs have failed to plead facts supporting a disability discrimination claim, Plaintiffs maintain that, because they have adequately pled the denial of a FAPE with regard to BD's seizure disorder, they have also sufficiently pled a claim for disability discrimination, asserting that "courts have found allegations that a student has been denied a FAPE sufficient to allege a claim under Section 504," because "[a] child denied a FAPE has effectively been discriminated against because of his disability." (Id. at 7-8.)

Further, Plaintiffs maintain that they have plausibly alleged deliberate indifference on the part of Defendant, satisfying the intentionality requirement for purposes of compensatory damages under Section 504.  (Id. at 9.)  Plaintiffs argue that they have plausibly alleged deliberate indifference on the part of CLSD resulting from CLSD's failures to: (1) follow BD's established Individualized Health Plans; (2) sufficiently protect BD from bullying based on disability by not creating a written safety plan; and (3) provide BD with counseling services and emotional support, "despite knowledge of BD's suicidal ideations and emotional needs."  (Id. at 10-11.)  Ultimately, Plaintiffs maintain that the complaint's "allegations that the District was aware of the Student's academic, emotional, medical, and social needs, but failed to develop appropriate plans in response, are sufficient to allege that the District exhibited deliberate indifference."  (Id. at 11.)

### 3. Whether Plaintiffs Have Stated a Claim for Disability Discrimination Under Section 504 and the ADA

As an initial matter, the Court agrees with Plaintiffs' position that, in concluding that CLSD denied BD a FAPE under Section 504 in connection with his seizure disorder, the Hearing Officer did not "dismiss" Plaintiffs' disability discrimination claim when she concluded that any claims of discrimination beyond a denial of FAPE under the IDEA were outside the scope of an administrative due process proceeding.  Defendant does not dispute that Plaintiffs have plausibly alleged the first and second elements of a claim of disability discrimination – that BD has a disability and was otherwise qualified to participate in a school program – but instead dispute whether Plaintiffs have plausibly alleged the third element of such a claim – that BD was subject to discrimination because of his disability, and further, whether Plaintiffs have plausibly alleged deliberate indifference on the part of CLSD, supporting the intentionality requirement for purposes of compensatory damages.

Upon careful consideration of the factual allegations of Plaintiffs' complaint, the arguments of the parties, and the relevant law, and construing all reasonable inference to be drawn therefrom in a light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly alleged disability discrimination under Section 504.  As to the issue of whether BD was subjected to discrimination because of his disability, the Court acknowledges that, as Plaintiffs maintain, if the state fails to provide a disabled child with a FAPE as required by the IDEA, then it also may "violate[] the [Rehabilitation Act] because it is denying a disabled child a guaranteed education merely because of the child's disability.  It is the denial of an education that is guaranteed to all children that forms the basis of the claim."  See Andrew M, 490 F.3d at 350; J.C. v. Lakeland School Dist., No. 3:10cv1779, 2011 WL 1327439, at *5 (M.D. Pa. Apr. 5, 2011) (stating that "qualified disabled children . . . who are denied a FAPE in violation of the IDEA under Part B have, by the definition set forth in 34 C.F.R. § 104.3(a)(2)(iii), been denied the school's services or discriminated against because of their disability").  Here, at least with regard to Plaintiffs' claim regarding CLSD's response to BD's seizure disorder and failure to comply with his Individualized Health Plans pertaining to that disorder, where the Hearing Officer Decision found a denial of FAPE with regard to that claim, and Defendant has not challenged Plaintiffs' pleading of a claim for denial of a FAPE based on BD's seizure disorder, based on the above authority, the Court finds that Plaintiffs have plausibly pleaded discrimination on the basis of a disability.

Moreover, the Court concludes that, at least with regard to CLSD's response to BD's seizure disorder, Plaintiffs' complaint plausibly pleads a claim of deliberate indifference on the part of CLSD by alleging that: CLSD had actual knowledge of BD's seizure disorder; CLSD created BD's Individualized Health Plans to accommodate that seizure disorder in conjunction

with Parents; and CLSD failed to comply with BD's Individualized Health Plans regarding his seizure disorder.  In light of the complaint's allegations of CLSD's knowledge and failure to act despite that knowledge, the Court finds that Plaintiffs' complaint supports a plausible inference of deliberate indifference on the part of CLSD with regard to the issue of BD's seizure disorder. See Durrell, 729 F.3d at 265 (stating that deliberate indifference requires "knowledge that a federally protected right is substantially likely to be violated" and a "failure to act despite that knowledge").  Accordingly, the Court will deny Defendant's motion to dismiss Counts III and IV of Plaintiffs' complaint.  The Court turns to Plaintiffs' claim of disability harassment under Section 504 and ADA Title II.

### B.      Disability Harassment Under Section 504 and ADA Title II

#### 1.      Legal Standard

To maintain a cause of action for disability harassment under Section 504 and Title II of the ADA, a plaintiff must demonstrate "(1) the child is an individual with a disability; (2) he or she was harassed based on that disability; (3) the harassment was sufficiently severe and pervasive that it altered the condition of his or her education and created an abusive educational environment; (4) the defendant had actual knowledge of the harassment; and (5) the defendant was deliberately indifferent to the harassment."  See M.S. ex rel. Shihadeh v. Marple Newtown Sch. Dist., 82 F. Supp. 3d 625, 635 (E.D. Pa.), aff'd in part, vacated in part, remanded sub nom., M.S. v. Marple Newtown Sch. Dist., 635 F. App'x 69 (3d Cir. 2015).

#### 2.      Arguments of the Parties

Defendant argues that this count is subject to dismissal because Plaintiffs' complaint fails "to allege sufficient facts of a plausible claim showing that B.D. was bullied or harassed solely due to his disability, and that such alleged student-on-student harassment constitutes disability

discrimination by the District." (Doc. No. 8 at 15.)  First, Defendant maintains that "the same factual allegations were made at the administrative level," but the Hearing Officer "dismiss[ed] any claims related to disability harassment" because she "describe[d] such allegations of harassment as 'relatively few and isolated as contrasted with any type of pattern.'" (Id.) (quoting Doc. No. 3 at 35).  Further, Defendant maintains that the bullying incidents alleged in the complaint were isolated and do not constitute a pattern of harassment.  (Id.)

Plaintiffs maintain that Defendant's response to BD's bullying at the hands of XY demonstrated deliberate indifference.  First, they maintain that the complaint adequately alleges that the bullying of BD by XY was due to his disability, arguing that "Plaintiffs allege bullying based on BD's academic needs and deficits when noting in the [c]omplaint that [BD] was mocked for his failing grade, and being 'dumb' and 'retarded.'" (Doc. No. 10 at 8.)  Plaintiffs also argue that the complaint alleges "that the bullying became so extreme that Parents requested safety plans and changes to the 504 Plan to address the harassment from another student." (Id.) Finally, Plaintiffs maintain that CLSD's response to the bullying of BD was to "deliberately exclude[] [BD] from unstructured class activities in order to head off the bullying," which "alone is a serious and direct exclusion of [BD] from the benefits of his education on account of a disability," which then "resulted in more bullying and harassment on the playground and in the lunchroom." (Id.)

### 3.  Whether Plaintiffs Have Stated a Claim for Disability Harassment Under Section 504 and the ADA

The Court notes that, as to Defendant's first point, the Hearing Officer Decision discussed Plaintiffs' allegations of disability harassment, and noted that the Third Circuit has "recognized that that a student who is the victim of bullying and whose special education program is adversely impacted as a result can be denied FAPE." (Doc. No. 3 at 35.)  However,

29

she noted that the facts elicited during the administrative proceeding on this point "were relatively few and isolated as contrasted with any type of pattern," such that they "do not support a conclusion that [CLD] violated [BD]'s right to FAPE on this basis," but ultimately stated that "the specific allegations in this case related to bullying are well outside this hearing officer's jurisdiction."  (Id.)  As a result, the Hearing Officer's discussion of this point is somewhat unclear as to whether she makes any formal findings or conclusion regarding the allegations of disability harassment given her statement that a determination of the issue is "well outside [her] jurisdiction."

Upon careful consideration of the arguments of the parties and the relevant law, and accepting as true all factual allegations in Plaintiffs' complaint and construing all reasonable inferences to be drawn therefrom in a light most favorable to Plaintiffs, the Court finds that the facts alleged by Plaintiffs support a plausible inference that BD was harassed at least in part because of his disability, and that the harassment was sufficiently severe and pervasive so as to alter the conditions of his environment.  Plaintiffs allege that BD was subject to name-calling (i.e., "dumb" and "retarded") by XY related to his poor grades and struggles to complete assignments.  (Doc. No. 1 ¶¶ 136-138.)  With respect to whether Plaintiffs have plausibly alleged "severe and pervasive" disability harassment, Plaintiffs' complaint alleges that the bullying became extreme enough that Parents requested a safety plan and changes to BD's 504 Plan in order to protect BD from the bullying of XY.  (Id. ¶¶ 141, 144, 147.)  Plaintiffs' complaint alleges that CLSD addressed the issue of XY's bullying of BD by requiring Parents to attend field trips and "unstructured" school activities if BD planned to participate, and requiring BD to avoid XY, which the complaint alleges resulted in more bullying and harassment on the playground and lunchroom.  (Id. ¶¶ 145-145, 160.)

With regard to CLSD's knowledge of the disability-related bullying of BD by XY, Plaintiffs' complaint clearly alleges CLSD's knowledge of the bullying incidents.  (Id. ¶¶ 139, 140, 150, 164-160.)  As to the element of deliberate indifference, Plaintiffs point to a pattern of failure to document bullying incidents, which supports an inference of deliberate indifference to the bullying of BD.  Further, Plaintiffs' complaint alleges that when BD began to experience suicidal thoughts – which Plaintiffs' complaint alleges were triggered by "math tests, conflicts during basketball, and conflicts with peers – all activities that occur during the school day" – Parents provided CLSD with a Suicide Safety Plan prepared by an outside medical provider, but CLSD failed to complete any follow-up evaluation or inform staff members regarding the same upon BD's transition to middle school, further plausibly supporting an inference of deliberate indifference to the bullying experienced by BD.  For all of the above reasons, the Court is persuaded that Plaintiffs' complaint plausibly alleges a claim of disability harassment under Section 504, and will therefore deny Defendant's motion to dismiss this claim.  The Court turns to Plaintiffs' claims of racial discrimination.

### C.     Title VI Racially Hostile Environment (Count VI)

#### 1.     Legal Standard

Title VI permits the parents of a school student to bring suit against a school district for its failure to address a racially hostile environment.  See Saxe v. State Coll. Area Sch. Dist., 240 F.3d 200, 206 n.5 (3d Cir. 2001).  To maintain a claim for a racially hostile environment under Title VI, a plaintiff must allege that the defendant acted with deliberate indifference to known "severe, pervasive, and objectively offensive" harassment.  See Bridges ex rel. D.B. v. Scranton Sch. Dist., 644 F. App'x 172, 179 (3d Cir. 2016).  Liability under Title VI requires that a school

district's "response [be] 'clearly unreasonable in light of the known circumstances.'"  See id.
(quoting Davis v Monroe Cty. Bd. Of Educ., 526 U.S. 629, 648 (1999)).

### 2.        Arguments of the Parties

Defendant again initially argues that this claim was heard by the Hearing Officer "who
found that instances of alleged bullying were 'relatively few and isolated as contrasted with any
type of pattern,' and yet the Plaintiffs have not appealed that part of the Hearing Officer's
decision."  (Doc. No. 8 at 17.)  Moreover, Defendant argues that the facts alleged by Plaintiffs
fail to rise to the level of pervasiveness required to plausibly allege a claim of racially hostile
environment.  (Id.)

In response, Plaintiffs maintain that "[c]ourts have found the requisite pervasiveness in
cases with a large number of individual incidents and in those with very few, but particularly
egregious, incidents."  (Doc. No. 10 at 14.)  They further maintain that "case law makes clear
that intermittent verbal harassment, including the use of racial epithets, can create an actionable
hostile environment."  (Id.)  Plaintiffs argue that "BD has alleged facts sufficient to establish
that he was subject to race-based harassment by classmates, that the harassment went beyond the
'teasing' kind, that it was subjectively damaging to BD, and that it went unaddressed by District
officials," pointing to the allegations that "BD was called 'n-word' several times in school," and
that "BD was called this epithet on the bus and Parent immediately drove to the school to report
it."  (Id. at 15.)  Plaintiffs further argue that "BD also alleges enduring racial insensitivity in
classes when his class read an article titled, 'Rich whites and poor students of color more and
more separated in schools.'"  (Id.)

### 3.        Whether Plaintiffs Have Stated a Claim for Racially Hostile
Environment under Title VI

As an initial matter, with regard to Defendant's argument concerning statements in the Hearing Officer Decision about the prevalence of instances of bullying, the Court notes that the statements referenced were in the context of the Hearing Officer's discussion of disability harassment, as the Hearing Officer Decision does not purport to address the issue of alleged race discrimination.  Plaintiffs' complaint contains the following factual allegations related to the existence of an alleged racially hostile environment:  (1) XY called BD a 'n-word' on several occasions, one of which was reported to CLSD after the incident (Doc. No. 1 ¶¶ 148-49); (2) CLSD's middle school principal testified that "there were no black teachers at the school, no black administrators, and 'ten to fifteen maybe' black students in the school, out of a total enrollment of about 550" (id. ¶ 150); (3) testimony at the administrative proceeding revealed that Parents "offered to organize a racial sensitivity training for [CLSD] employees [and] offered to pay for it as well," although CLSD "has never acted on Parent's offer because during [the middle school principal's] time at the District there have been no assemblies devoted specifically to diversity or racial sensitivity" (id. ¶ 151); and (4) BD "endured racial insensitivity during his classes where his class read and discussed an article titled, '[r]ich whites and poor student of color more and more separated in schools" (id. ¶ 152).

Upon careful consideration of the factual allegations of Plaintiffs' complaint, the arguments of the parties and the relevant law, and accepting as true all factual allegations in Plaintiffs' complaint and construing all reasonable inferences to be drawn therefrom in a light most favorable to Plaintiffs, the Court finds that Plaintiffs have failed to allege facts supporting a plausible inference that the alleged racial harassment was sufficiently "severe and pervasive" to state a claim under Title VI.  Clearly, the use of the "n-word" by XY to BD is "objectively offensive";  however, Plaintiffs' complaint alleges only one incident where CLSD had certain

knowledge of its use – when the epithet was used on the bus and BD's Parent drove immediately to school to report it.  Plaintiffs' claim of student-on-student racial harassment via the use of the 'n-word,' where Plaintiffs allege only one incident where CLSD had knowledge of its use, is simply insufficient to raise a plausible inference of "severe and pervasive" harassment.  In Whitfield v. Notre Dame Middle School, 412 F. App'x 517, 521 (3d Cir. 2011), the Third Circuit noted that Title VI liability for student-on-student racial discrimination requires that the school's response be "clearly unreasonable in light of the known circumstances."  See id.  In that case, while the "n-word" was not utilized, the Court found that three instances of racially motivated student-on-student harassment failed to rise to the level of "severe and pervasive" harassment. See id. at 519-20.  Plaintiffs' additional allegations regarding the minimal numbers of individuals of color in the school environment, CLSD's failure to hold any assemblies devoted to racial sensitivity, and one instance where BD's class discussed an article referring to students of color, do not suffice to support a plausible inference that BD's school was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive' to create a subjectively and objectively hostile or abusive environment."  See Moore v. Solanco Sch. Dist., 471 F. Supp. 3d 640, 655 (E.D. Pa. 2020) (quoting Davis, 526 U.S. at 652).  Accordingly, the Court will grant Defendant's motion to dismiss Count VI of Plaintiffs' complaint.  The Court next addresses Plaintiffs' claim of hostile educational environment in violation of Section 1981.

**D.     Section 1983 Claim for Unlawful Deprivation of Federal Rights Secured by Section 1981 (Count VII)**

**1.   Legal Standard**

Section 1981 prohibits discrimination on the basis of race in the making and enforcement of contracts and property transactions, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

See 42 U.S.C. § 1981(a).  To maintain a claim for unlawful deprivation of rights secured by Section 1981, a plaintiff must allege facts showing that he or she is: (1) "a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts. . . ."  See Brown v. Philp Morris, Inc., 250 F.3d 789, 797 (3d Cir. 2001) (citation and quotation omitted).  To maintain a claim of hostile educational environment under Section 1981, a plaintiff must show that: (1) he or she is a "member[] of a protected class"; (2) he or she was "harassed because of race"; (3) the defendant[] "had actual knowledge of and was deliberately indifferent to the harassment"; and (4) "the harassment was so severe and objectively offensive that it deprived the plaintiff[] of access to the educational benefits or opportunities provided by the school."  See Solanco, 471 F. Supp. 3d at 657.  Section 1983 "constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units . . . ."  See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733 (1989).

In Monell v. N.Y.C. Dept. of Social Servs., 436 U.S. 658 (1978), the Supreme Court established that municipalities can be held liable for constitutional violations under 42 U.S.C. § 1983.  See id. at 690. However, municipal liability is limited to those actions for which the municipality itself is actually responsible.  See Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986). Specifically, liability attaches when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  See Monell, 436 U.S. at 694.  That is, a municipality is subject to

Section 1983 liability only to the extent it maintained an unconstitutional custom or policy that caused the constitutional violations alleged by Plaintiff.

A municipal policy is a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers."  See City of Canton v. Harris, 489 U.S. 378, 385 (1989).  A custom is "an act 'that has not been formally approved by an appropriate decision maker,' but is 'so widespread as to have the force of law.'"  See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (quoting Bd. Of the Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 404 (1997)).  In order to recover from a municipality under this theory of Section 1983, a plaintiff must show "a direct causal link between the municipal policy or custom and the alleged constitutional deprivation."  See City of Canton, 489 U.S. at 385.  Complaints alleging municipal liability under Section 1983 are not subject to heightened pleading standards.  See Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit, et al., 507 U.S. 163, 168 (1993).  However, a plaintiff attempting to establish a Monell claim must "identify a custom or policy, and specify what exactly that custom or policy was." See McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009).

### 2.      Arguments of the Parties

Defendant maintains that Plaintiffs' allegations regarding Parents and BD's "contractual relationship with the District inasmuch as the District was required to deliver an educational program to BD and BD was expected to abide by the rule, restrictions, and rewards of being a student enrolled in the District schools" fails to adequately allege the existence of a contract within the meaning of Section 1981 because "contracts with school districts require approval by the School Board President, with authorization from the Board of School Directors."  (Doc. No. 8 at 20) (quoting Doc. No. 1 ¶ 276).  Further, Defendant argues that Plaintiff has failed to state a

plausible Section 1981 claim pursuant to <u>Monell</u> because Plaintiffs have not identified any District policy or custom that violated Section 1981.  (Doc. No. 8 at 19.)  Rather, Defendant argues that, in connection with their Section 1981 claim, Plaintiffs "assert only scant and conclusory allegations that there were 'comments, jokes, or act of a racial nature made or done by the District's employees,'" which conclusory allegations are insufficient to state a <u>Monell</u> claim under Section 1981.  (<u>Id.</u> at 19-20) (quoting Doc. No. 1 ¶ 280).

In response, as noted above, Plaintiffs allege that "Parents had a contractual relationship with the District inasmuch as the District was required to deliver an educational program to BD, and BD was expected to abide by the rules, restrictions and rewards of being a student enrolled in District schools."  (Doc. No. 10 at 16.)  Plaintiffs maintain that they "have set forth multiple averments with respect to comments, jokes or acts of a racial nature that were directed to [BD] by District staff," and "[d]espite the family's attempts to put the District on notice, nothing was put in place to appropriately protect BD," and that, therefore, "[b]y disregarding the racially-hostile experiences BD had in the District, the District staff fostered a hostile educational environment and acted intentionally/recklessly, and with deliberate indifference, in disregarding BD's emotional and physical safety."  (<u>Id.</u>)  Plaintiffs maintain that "the practice of not recording bullying incidents . . . as well as the conduct of the District's employees in respect of [BD]'s race and the racial environment . . . had the effect of setting up a bureaucratic barrier – a barrier against any efforts to acknowledge issues of racial tensions, let alone address them" and that "[i]t was that barrier, together with the unrelenting bullying, that interfered with [BD]'s performance at school and created an intimidating, hostile or offensive educational environment."  (<u>Id.</u> at 17.)

    **3.   Whether Plaintiffs Have Stated a Claim Under Section 1983 for Unlawful Deprivation of Federal Rights Secured by Section 1981**

The Court first addresses Defendant's argument that "there is no contract that the Plaintiffs seek to enforce here" for purposes of Section 1981.  "The 'full and equal benefit' clause gives § 1981 broader applicability than the mere right to contract."  See Solanco, 471 F. Supp. 3d at 664.  However, Section 1981's 'full and equal benefit' clause extends only to state actors.  See Brown, 250 F.3d at 799.  Accordingly, "because Congress never explicitly created a remedy against state actors under § 1981(c), nor expressed its intent to overrule Jett [which held that Section 1983 constitutes the exclusive federal remedy for violation of rights guaranteed by Section 1981 by state actors]," "'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981.'"  See Solanco, 471 F. Supp. 3d at 664 (quoting McGovern v. City of Phila., 554 F.3d 114, 120-21 (3d Cir. 2009) (internal quotation omitted)).  Accordingly, the Court considers Plaintiffs' Section 1981 claim against CLSD in the context of a Section 1983 Monell claim, which, as discussed more fully above, requires Plaintiffs to "identify a custom or policy, and specify what exactly that custom or policy was" and how it violated Section 1981.  See McTernan, 564 F.3d at 658.

Plaintiffs' complaint contains the following factual allegations related to a violation of Section 1981: (1) "Plaintiffs have set forth multiple averments, supra, with respect to comments, jokes or acts of a racial nature made or done by the District's employees," (Doc. No. 1 ¶ 280); and (2) "[t]he conduct of the District's employees in respect of Student's race had the effect of interfering with Student's performance at school and created an intimidating, hostile or offensive educational environment" (id. ¶ 281).

Upon careful consideration of the factual allegations of Plaintiffs' complaint, the arguments of the parties, and the relevant law, and accepting as true all factual allegations in Plaintiffs' complaint and construing all reasonable inferences to be drawn therefrom in a light

most favorable to Plaintiffs, the Court finds that Plaintiffs have failed to allege facts supporting a plausible inference that Defendant had a custom, policy, or practice that resulted in racial discrimination against BD in violation of Section 1981.  The Court notes that, in opposition to Defendant's motion, Plaintiffs maintain that they "have set forth multiple averments with respect to comments, jokes or acts of a racial nature that were directed to [BD] by District staff," citing paragraphs 148 through 175 of their complaint.  However, the Court's review of the relevant paragraphs indicates that there are no factual allegations describing "comments, jokes or acts of a racial nature directed to [BD] by District staff" contained in those paragraphs, much less allegations describing a "custom or policy" of the same so as to support a Monell claim.

To the extent that Plaintiffs maintain that the complaint contains allegations of "the practice of not recording bullying incidents," (Doc. No. 10 at 17), the Court notes that "[t]his argument fails because . . . a school's failure to respond to reports of bullying cannot give rise to liability under § 1983 because it is not an affirmative act."  See G.S. v. Penn-Trafford Sch. Dist., 813 F. App'x 799, 803 (3d Cir. 2020); Lansberry v. Altoona Area Sch. Dist., 356 F. Supp. 3d 486, 503 (W.D. Pa. 2018) (noting that "the cases are in agreement that students do not have a constitutional right to be free from bullying and harassment from other students," and so "harm caused by student-on-student bullying is not a constitutional harm that Monell protects against").  For the above reasons, the Court will grant Defendant's motion to dismiss Count VII of Plaintiffs' complaint.  The Court next addresses Plaintiffs' claim for intentional infliction of emotional distress.

### E. Intentional Infliction of Emotional Distress (Count IX)

#### 1. Legal Standard

A cause of action for intentional infliction of emotional distress requires allegations supporting a plausible inference that the defendant "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress to another," and that bodily harm resulted.  See Hoy v. Angelone, 720 A.2d 745, 753 (Pa. 1998).

### 2.    Arguments of the Parties

Defendant argues that this claim should be dismissed because it is entitled to immunity under the Pennsylvania Subdivision Tort Claims Act ("PSTCA"), and further, that, in any event, the allegations of Plaintiffs' complaint fail to satisfy the requirement of "extreme and outrageous conduct."  (Doc. No. 8 at 21-23.)  In response, Plaintiffs maintain that the "issue of whether the acts or omissions constituted outrageous conduct is a question of fact, to be resolved by a fact-finder," and that "[a]n official no longer holds immunity when the 'act constituted a crime, actual fraud, actual malice or willful misconduct.'"  (Doc. No. 10 at 17-18.)  Plaintiffs maintain that they "have pleaded that the Defendant acted willfully when [it] knew about BD's needs and still chose not to provide adequate support."  (Id. at 18.)

### 3.    Whether Plaintiffs Have Stated a Claim for Intentional Infliction of Emotional Distress

Upon careful consideration of the factual allegations in Plaintiffs' complaint, the arguments of the parties, and the relevant law, and accepting as true all factual allegations in the complaint and construing all inferences to be drawn therefrom in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs' claim for intentional infliction of emotional distress against CLSD (Count IX) is barred by the immunity granted by the Political Subdivision Tort Claims Act.  Pennsylvania's Political Subdivision Tort Claims Act begins with the premise that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof," subject only to certain

40

limited exceptions.[5]  See 42 Pa.C.S.A. § 8541.  The PSTCA extends this same immunity to local

agency employees as long as the employee was acting within the scope of his or her

employment.  See 42 Pa.C.S.A. § 8545.  However, the statute provides that the employee will

not be entitled to this immunity if "it is judicially determined that the act of the employee caused

the injury and that such act constituted a crime, actual fraud, actual malice or willful

misconduct."  See 42 Pa.C.S.A. § 8550.

In arguing that the Court should deny Defendant's motion to dismiss this claim, Plaintiffs

attempt to take advantage of the "willful misconduct" exception to PSTCA immunity, pointing to

the complaint's allegations that CLSD's conduct "was undertaken in willful, wanton, reckless,

and total disregard of its likely effects on the rights, safety and well being of [BD]."  (Doc. No. 1

¶ 300.)  The problem with Plaintiff's argument is that "[w]illful misconduct, however, does not

provide an exception to the local agency's immunity."  See M.U. v. Downingtown High Sch.

East, 103 F. Supp. 3d 612, 630 (E.D. Pa. 2015) (emphasis added); see also Palmer v. Bartosh,

959 A.2d 508, 512 n.3 (Pa. Commw.Ct. 2008) (stating that "[t]he [PSTCA] waives governmental

immunity only for certain negligent acts of the agency or its employees; where the employee's

conduct is intentional in nature, the local agency retains its governmental immunity").

Accordingly, an employee of CLSD who engaged in willful misconduct could be individually

liable under the PSTCA, but that liability would not extend to the local agency employing him or

her (CLSD).  Here, where Plaintiffs have alleged a claim of intentional infliction of emotional

---

[5]  The exceptions are set forth in the 42 Pa.C.S.A. § 8542, which provides that local agencies and
their employees are liable only for negligent acts falling into one of the following categories:
(1)vehicle liability; (2) care, custody or control of personal property; (3) care, custody or control
of real property; (4) dangerous conditions of trees, traffic controls, or street lights; (5) dangerous
conditions of utility services facilities; (6) dangerous conditions of streets; (7) dangerous
conditions of sidewalks; (8) care, custody, or control of animals; and (9) sexual abuse.  See
Pa.C.S.A. § 8542.

distress against only the local agency, CLSD, as opposed to any employees of it, the PTSCA bars Plaintiffs' claim.  Therefore, the Court will grant Defendant's motion to dismiss Count IX of Plaintiffs' complaint with prejudice.

      **F.    Leave to Amend**

In their brief in opposition to Defendant's motion, Plaintiffs request the opportunity to amend their complaint in the event the Court is inclined to dismiss any counts of the complaint. Mindful of the Third Circuit's repeated admonition that "district courts must offer amendment [in civil rights cases] – irrespective of whether it is requested – when dismissing a case for failure to state a claim unless doing so would be inequitable or futile," see Mullin v. Balicki, 875 F.3d 140, 151 (3d Cir. 2017) (quoting Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 251 (3d Cir. 2007)), and because, with regard to Counts VI and VII, the Court cannot conclude definitively that further amendment would be futile, the Court will grant Plaintiffs the opportunity to file an amended complaint in an effort to correct the pleading deficiencies of the complaint identified herein with regard to those counts.  Because the immunity bar to Plaintiffs' intentional infliction of emotional distress claim would render any attempt to amend that claim futile, the Court will dismiss Count IX with prejudice and without leave to amend.

**IV.    CONCLUSION**

For all of the foregoing reasons, the Court will grant in part and deny in part Defendant's motion to dismiss, and permit Plaintiffs the opportunity to file an amended complaint in an effort to address the pleading deficiencies of Counts VI and VII identified herein.  An appropriate Order follows.